Filed 7/22/26  P. v. Joseph CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D088033 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF2007561) |
| ANDREW DANIEL JOSEPH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Affirmed.

Kessler & Seecof and Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Donald W. Ostertag and Elana Miller, Deputy Attorneys General.

Andrew Daniel Joseph appeals the judgment sentencing him to prison after a jury found him guilty of second degree murder and elder abuse likely

to produce great bodily harm or death.  He contends the evidence introduced at trial was insufficient to support the malice element of murder.  We disagree and affirm the judgment.

I.

BACKGROUND

A.  *Facts*

On September 18, 2020, Joseph lived with his maternal grandfather, Aircey Hayes, and his grandfather's wife, Ethel.  Aircey went out in the morning and left Ethel and Joseph at home alone.

At approximately 12:45 p.m. that day, the Hayeses' next-door neighbor, Patricia Diaz, received a notification on her cell phone that somebody had activated her electronic doorbell.  The doorbell has a motion-activated camera and transmits sound.  Diaz opened the application on her phone to see who was at the door but did not recognize the person right away.  When the person began to talk, Diaz recognized her as Ethel.  Ethel told Diaz, "[Joseph] jumped on me and beat me up," and asked Diaz to contact Aircey.  Diaz's minor children were at home and went out onto the porch to sit with Ethel and to telephone Diaz.  When Diaz got home, Ethel was there and "looked really bad."  "She was beaten.  She had bruises on her head.  She had swelling. . . .  She had dry blood on her."  Diaz called 911.

A paramedic arrived about an hour later and found Ethel unconscious.  Her face was severely swollen, and her eyes were swollen shut.  Ethel's pupils were dilated and nonreactive to light.  Blood was coming from her nose and mouth.  Ethel's jaw was clenched, and her bottom teeth were loose.  She was taken by ambulance to a hospital.  A scan revealed a " 'brain bleed,' " i.e., a collection of blood between the brain surface and its outer covering.  Medical

2

staff determined Ethel was not a candidate for surgery due to the extent of her injuries.

Law enforcement officers went to the Hayeses' house to investigate. Joseph's cousin, Harry Fouse, was there. In a recorded interview, Fouse told a detective that Joseph said Ethel "spazzed out on him" while he was eating and he "just went there." There were no signs of forced entry. Blood stains were found on the dryer, the linen closet door jamb, and the hallway floor.

Ethel never regained consciousness after she was taken to the hospital and died four days later at age 83. A forensic pathologist performed an autopsy. On external inspection, the pathologist noted numerous head injuries, including abrasions of the scalp and ear; contusions around the eyes, jaw, lower lip, and chin; lacerations of the lower lip and back of the head; and fluid accumulation under the scalp. According to the pathologist, the multiple injuries to Ethel's head were less likely the result of a single fall than of multiple blows. Upon dissection, the pathologist found hemorrhages between the scalp and skull, in the muscles on the sides of the head, and between the surface of the brain and its coverings. The hemorrhages on the brain were caused by forces that sheared blood vessels. The pathologist determined the cause of death was blunt force trauma to the head.

B.    *Proceedings*

The People charged Joseph with murder (Pen. Code, § 187, subd. (a); subsequent section references are to this code) and elder abuse likely to produce great bodily harm or death (§ 368, subd. (b)(1)). They alleged that in committing the elder abuse, he proximately caused the death of a person 70 years of age or older. (§ 368, subd. (b)(3)(B).) The People alleged Joseph had two prior convictions that constituted serious felonies for purposes of five-

3

year enhancements (§ 667, subd. (a)(1)) and strikes for purposes of the "Three Strikes" law (*id.*, subds. (b)–(i), § 1170.12).

The case proceeded to a jury trial at which the People established the facts summarized in part I.A., *ante*, through live testimony from Aircey, Diaz, Fouse, the forensic pathologist, and other witnesses; stipulated testimony of the paramedic and hospital medical staff; recordings of the conversation Ethel had with Diaz via the electronic doorbell and of the detective's interview of Fouse; photographs of Ethel's injuries; and other evidence. Joseph did not testify or present any other evidence.

The jury found Joseph guilty of second degree murder and elder abuse likely to cause great bodily harm or death. It found true the allegation that in committing the elder abuse he proximately caused the death of a person 70 years of age or older.

Joseph waived his right to a jury trial and had a court trial on the prior conviction allegations. The court found them true.

At the sentencing hearing, the trial court partially granted Joseph's motion to strike both prior convictions and struck one. It sentenced Joseph to prison for 15 years to life on the second degree murder conviction (§ 190, subd. (a)) and doubled the term to 30 years to life based on the remaining prior strike conviction (§§ 667, subd.(e)(1), 1170.12, subd. (c)(1)). The court imposed a determinate prison term on the elder abuse conviction (§ 368, subd. (b)(1), (3)(B)) and stayed its execution under section 654. It declined to impose the additional punishment for the prior serious felony conviction it had not stricken. (§ 1385, subds. (a), (b)(1).)

II.

DISCUSSION

Joseph attacks the sufficiency of the evidence to support his murder conviction. He contends the federal Constitution forbids the conviction unless the People presented evidence sufficient to convince the jury beyond a reasonable doubt of the existence of every element of murder. (U.S. Const., 14th Amend., § 1; *Jackson v. Virginia* (1979) 443 U.S. 307, 316 (*Jackson*).) Joseph argues the People did not meet their burden on the malice element because, he says, no evidence proved beyond a reasonable doubt that he intended to kill Ethel (express malice) or intentionally committed an act known to involve a high risk of death with conscious disregard of the risk (implied malice). He asks us to reverse the murder conviction.

On a challenge to the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson, supra*, 443 U.S. at p. 319.) We consider the entire record, deem the jury to have resolved all evidentiary conflicts in favor of the prosecution, and presume in support of the verdict every inference the jury reasonably could have drawn from the evidence. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; *People v. Bandhauer* (1970) 1 Cal.3d 609, 617.) We must uphold the verdict unless there is no substantial evidence (i.e., evidence that is reasonable, credible, and of solid value) to support an essential element of the crime. (*Penunuri*, at p. 142; *People v. Johnson* (1980) 26 Cal.3d 557, 577.)

The essential element at issue here is malice. "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd.

5

(a).)[1] Malice may be express or implied. (§ 188.) It is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature" (*id.*, subd. (a)(1)) and implied "when the circumstances attending the killing show an abandoned and malignant heart" (*id.*, subd. (a)(2)). "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) "[U]nder an implied malice theory of second degree murder, the requisite mental state for murder—malice aforethought— is by definition 'implied,' as a matter of law, from the specific intent to do some act dangerous to human life together with the circumstance that a killing has resulted from the doing of such act." (*People v. Swain* (1996) 12 Cal.4th 593, 603, italics omitted.) Implied malice requires intentional performance of an act dangerous to human life with knowledge of the danger and conscious disregard for life. (*In re Ferrell* (2023) 14 Cal.5th 593, 600; *People v. Cravens* (2012) 53 Cal.4th 500, 508 (*Cravens*).) "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller, supra*, 41 Cal.4th at p. 143.)

Implied malice may be proved by circumstantial evidence. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107; *People v. Saucedo* (2023) 90 Cal.App.5th 505, 512.) In cases of fatal beatings, courts have held malice

---

[1] Murder is divided into two degrees. (§ 189.) Joseph was convicted of second degree murder, which "is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)

could be implied from the nature of the beating and the resultant injuries.

For example:

- Intentionally striking the head of a vulnerable victim with such force as to cause him to lose consciousness, fall, and fracture his skull sufficed to establish implied malice. (*Cravens, supra*, 53 Cal.4th at pp. 508–509.)

- Evidence that the defendant participated in a fatal beating by punching, kicking, and throwing a bicycle on a bleeding victim while others beat him with baseball bats sufficed to support the defendant's conviction of implied malice second degree murder. (*People v. Gudiel* (2024) 107 Cal.App.5th 848, 859–860.)

- When the defendant caused extensive bruising to the torso, broken ribs, and bleeding on the brain by hitting the victim in the head, chest, stomach, and groin, and squeezing his head between a bed and a wall, "the jury could have easily inferred malice from the repeated violent beatings [the defendant] inflicted upon the victim which ultimately resulted in his death." (*People v. Matta* (1976) 57 Cal.App.3d 472, 480 (*Matta*).)

- Evidence that defendants caused the victim's spleen to rupture by kicking him 15 to 20 times during a period of 15 to 20 minutes as he bled and begged them to stop supported convictions of implied malice second degree murder. (*People v. Beyea* (1974) 38 Cal.App.3d 176, 188–189.)

- Malice could be implied when the victim died from a perforated bowel and related infection after "the defendant gave [the victim] an unmerciful beating while [he] was in a helpless condition." (*People v. Breland* (1966) 243 Cal.App.2d 644, 649, 653 (*Breland*); accord, *People v. Atkins* (1975) 53 Cal.App.3d 348, 354–355, 358–359 [malice could be implied when defendant struck victim's abdomen with such force as to perforate the bowel and victim died from resulting infection].)

Evidence comparable to that in the cited cases was introduced at Joseph's trial. There was evidence that Joseph beat Ethel inside the Hayeses' house. Aircey testified that he left Ethel and Joseph at home alone in the morning of the attack. A crime scene investigator testified there were no signs of forced entry, and she found blood stains at different locations in

the house.  In a recording of an interview played for the jury, Fouse told a detective that Joseph said Ethel "spazzed out on him" and "he just went there."  In a recording of the electronic doorbell conversation played for the jury, Ethel told Diaz, "[Joseph] jumped on me and beat me up."

There was also evidence the beating was sustained and severe.  Diaz testified Ethel "looked really bad" from all the bruises, swelling, and blood on her head.  The stipulated testimony of the paramedic was that Ethel was unconscious, had severe swelling of her head and loose teeth, and was bleeding from the nose and mouth.  The stipulated testimony of hospital medical staff was that Ethel "was suffering from obvious trauma to the face and head"; a scan revealed a brain bleed; her injuries were so extensive that she was not a surgical candidate; and she never regained consciousness before she died.  The pathologist testified Ethel had multiple head wounds and hemorrhages inside and outside the skull, which were more consistent with multiple blows than with a single fall, and died from blunt force trauma to the head.  Photographs of her injuries were admitted in evidence.  There was testimony that Ethel was 83 years old when she was beaten.

From this evidence the jury reasonably could infer Joseph delivered multiple blows to Ethel's head with such force as to loosen her teeth and to cause fatal bleeding between her skull and brain.  From the number and severity of her injuries and her age, the jury reasonably could infer he knew his actions were dangerous to her life and consciously disregarded that danger.  (See *Cravens, supra*, 53 Cal.4th at p. 511; *Matta, supra*, 57 Cal.App.3d at p. 480; *Breland, supra*, 243 Cal.App.2d at p. 653.)  We conclude sufficient evidence supports a finding that Joseph acted with implied malice in beating Ethel to death.

Joseph argues this conclusion is based on impermissible speculation. He points out that unlike *Cravens, supra*, 53 Cal.4th 500 and other cases cited above in which witnesses testified about the defendant's specific actions against the victim, in this case "the details of what actually happened inside the house with [Ethel] are unknown." Quoting a remark the court made to counsel during trial, Joseph contends: "Because 'no one really knows what happened in that house that day' [citation], the evidence is insufficient to prove beyond a reasonable doubt that [he] acted with malice aforethought." We disagree.

Joseph is correct that "mere speculation cannot support a conviction" (*People v. Marshall* (1997) 15 Cal.4th 1, 35) and that at trial no eyewitness testified about the details of the beating itself. The absence of such evidence, however, does not make the finding of implied malice speculative. "Evidence of a defendant's state of mind is almost inevitably circumstantial, [and] circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) As we have explained, the direct and circumstantial evidence that Joseph beat Ethel and the evidence of her extensive head injuries support the inference that he struck multiple violent blows and did so with " 'awareness [he was] engaging in conduct that endanger[ed] the life of another.' " (*Cravens, supra*, 53 Cal.4th at p. 507.) We must presume that in finding him guilty of second degree murder, the jury drew that inference and not his preferred inference that she died from a single fall. (*Id.* at pp. 507–508; *People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.) Proof of Joseph's "awareness of engaging in conduct that endangers the life of another" sufficed to establish the implied malice element of murder. (*Knoller, supra*, 41 Cal.4th at p. 143.)

9

Our conclusion that the evidence sufficed to support a finding of implied malice makes it unnecessary for us to decide whether the evidence also sufficed to support a finding of express malice. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 892, fn. 22 [when sufficient evidence supports one theory of guilt, court need not consider sufficiency of evidence to support alternative theory]; *People v. Rogers* (2006) 39 Cal.4th 826, 866–867 [malice required to support second degree murder conviction may be either express or implied].)

III.

DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

RUBIN, J.

BERMÚDEZ, J.